[ORAL ARGUMENT NOT SCHEDULED]

**No. 23-5220**

# In the United States Court of Appeals For the District of Columbia

CIGAR ASSOCIATION OF AMERICA et al.,
Plaintiffs-Appellees,

v.

UNITED STATES FOOD & DRUG ADMINISTRATION et al.,
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

## BRIEF FOR APPELLEES

Michael J. Edney
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 778-2204
*medney@huntonak.com*

Brian T. Burgess
Andrew Kim
Goodwin Procter LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000
*bburgess@goodwinlaw.com*
*andrewkim@goodwinlaw.com*

*Counsel for Appellees Premium Cigar Association and Cigar Rights of America*

*Counsel for Appellee Cigar Association of America*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 12(c) and 28(a)(1) and the Court's Order of October 2, 2023, Appellees provide the following certificate as to parties, rulings, and related cases:

### A. Parties, Intervenors, and *Amici Curiae*

Parties, intervenors, and *amici* who appeared before the district court:

| Plaintiffs: | Premium Cigar Association, formerly known as the International Premium Cigar and Pipe Retailers Association<br>Cigar Rights of America<br>Cigar Association of America<br>En Fuego Tobacco Shop LLC<br>Cuba Libre Enterprises LLC<br>Texas Cigar Merchants Association |
|---|---|
| Defendants: | United States Food and Drug Administration<br>United States Department of Health and Human Services<br>Sylvia Mathews Burwell, in her official capacity as Secretary of Health and Human Services (terminated Jan. 22, 2019)<br>Robert Califf, M.D., in his official capacity as Commissioner of Food and Drugs (terminated Jan. 22, 2018)<br>Scott Gottlieb, M.D., in his official capacity as Commissioner of Food and Drugs (terminated Oct. 23, 2019)<br>Alex M. Azar, II, in his official capacity as Secretary of Health and Human Services (terminated January 20, 2021)<br>Norman E. Sharpless, M.D., in his official capacity as Commissioner of Food and Drugs<br>Stephen Hahn, in his official capacity as Commissioner of Food and Drugs |

Intervenor-Plaintiffs:          Alec Bradley Cigar Distributors, Inc.
                                            Ashton Distributors, Inc.
                                            Holt Cigar Company, Inc.
                                            Crowned Heads, LLC
                                            A. Fuente & Co.
                                            Piloto Cigars, Inc.
                                            Rocky Patel Premium Cigars, Inc.
                                            Oliva Cigar Co.

*Amici* in Support of         Cause of Action Institute
Plaintiffs:                          State of Arizona
                                            State of Louisiana
                                            State of Michigan

*Amici* in Support of         American Academy of Pediatrics
Defendants:                       American Cancer Society Cancer Action Network
                                            American Heart Association
                                          American Lung Association
                                         American Thoracic Society
                                         Campaign for Tobacco-Free Kids
                                         Maryland Chapter-American Academy of
                                               Pediatrics
                                         Tobacco Control Legal Consortium
                                       Truth Initiative
                                       Leah Brasch
                                       Cynthia Fishman
                                       Linda Goldstein
                                       Steven Hirsch
                                       David Myles

Parties, intervenors, and *amici* in the Court of Appeals:

Plaintiffs-Appellees:        Premium Cigar Association
                                            Cigar Rights of America
                                            Cigar Association of America

Defendants-Appellants:    United States Food and Drug Administration

United States Department of Health and Human
   Services
Xavier Becerra, in his official capacity as
   Secretary of Health and Human Services
Robert McKinnon Califf, M.D., in his official
   capacity as Commissioner of Food and Drugs

*Amici* in Support of     American Academy of Pediatrics
Defendants-Appellants:  American Cancer Society Cancer Action Network
                    American Heart Association
                    American Lung Association
                    Campaign for Tobacco-Free Kids
                    Truth Initiative

## B. Rulings Under Review

The Government appeals two rulings in this seven-year-long case. Therein, the Honorable Amit P. Mehta of the United States District Court of the District of Columbia held that the United States Food and Drug Administration's decision to regulate premium cigars was arbitrary, capricious, and contrary to law and vacated the agency rule as applied to premium cigars. The rulings are (1) a July 5, 2022, opinion and order granting in part and denying in part the parties' cross-motions for summary judgment (JA16); and (2) an August 9, 2023, opinion and order vacating FDA's Final Rule as to premium cigars. JA3; JA4.

## C. Related Cases

Counsel is unaware of any related cases within the meaning of Circuit Rule 28(a)(1)(C). This Court has decided two prior appeals from prior orders in this case:

- No. 18-5195: *Cigar Ass'n of Am. v. United States Food & Drug Admin.*, 964 F.3d 56 (D.C. Cir. 2020);

iii

- No. 20-5266: *Cigar Ass'n of Am. v. United States Food & Drug Admin.*, 5 F.4th 68 (D.C. Cir. 2021).


/s/ *Michael J. Edney*
Michael J. Edney

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1(a) and D.C. Circuit Local Rules 26.1 and 28(a)(1)(A), Appellees Premium Cigar Association, formerly known as the International Premium Cigar and Pipe Retailers Association, Cigar Rights of America, and Cigar Association of America hereby file this Corporate Disclosure Statement and state as follows:

Premium Cigar Association ("PCA"), formerly known at the inception of proceedings in the District Court as the International Premium Cigar and Pipe Retailers Association, has no parent company, and no publicly held company has a 10% or greater ownership interest (such as stock or partnership shares) therein.  PCA is a non-profit trade association representing premium cigar and tobacco retail shops located throughout the United States and abroad.

Cigar Rights of America ("CRA") has no parent company, and no publicly held company has a 10% or greater ownership interest (such as stock or partnership shares therein). CRA is a non-profit association representing premium cigar manufacturers and consumers in the United States.

Cigar Association of America ("CAA") has no parent company, and no publicly held company has a 10% or greater ownership interest (such as stock or partnership shares) therein.  CAA is a non-profit trade association representing cigar manufacturers, importers, distributors, and major suppliers to the industry.

PCA, CRA, and CAA are "trade associations" within the meaning of D.C.

Circuit Local Rule 26.1(b).

/s/ *Michael J. Edney*
Michael J. Edney

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

STATEMENT OF THE CASE....................................................................3

I.    Premium Cigars Are Different Than Other Tobacco Products. ......................3

II.   Commenters Submit the Requested Evidence of Premium Cigars'
Different Usage Patterns and Resulting Health Effects. ................................7

III.  The Final Rule Ignored the Proposed Rule and Record Evidence. ................8

IV.  The FDA Subsequently Acknowledged That Premium Cigars Are
Different and That It Had Not Answered Key Questions in the Final
Rule. .........................................................................................................10

V.   The District Court Consistently Held FDA's Treatment of Premium
Cigars Arbitrary, While Upholding the Agency's Handling of Other
Tobacco Products. .....................................................................................13

SUMMARY OF ARGUMENT ...................................................................18

STANDARD OF REVIEW .........................................................................21

ARGUMENT ...............................................................................................21

I.    The District Court Correctly Determined that the FDA Mishandled the
"Central Consideration" of Whether Premium Cigars Are Used
Differently. ................................................................................................21

      A.   The District Court Correctly Held that the FDA Arbitrarily
Ignored Evidence Contrary to its Conclusion. ...................................22

      B.   The FDA Does Not Meaningfully Assign Error to the District
Court's Opinion Determining the APA Had Been Violated. ..............25

      C.   The District Court Did Not Supplant the FDA's Asserted
Scientific Expertise or Analysis. .......................................................36

II.   The FDA's Evaluation of Youth Usage Was Arbitrary and Capricious
in Violation of the Administrative Procedure Act.........................................38

III.    The FDA's Treatment of Usage Patterns and Youth Use Are Both
        Examples of the Agency Inappropriately Shifting the Burden For
        Justifying a Regulation to the Regulated. ...................................................42

IV.     The District Court Did Not Abuse Its Discretion by Vacating the
        Decision to Regulate Premium Cigars. ........................................................44

        A.      The FDA Does Not Even Argue That the District Court Abused
                Its Discretion by Ordering Vacatur. ...................................................44

        B.      Vacatur Is the Appropriate Remedy....................................................45

CONCLUSION .........................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ................................................................. 48

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ............................................................. 44

*Almay, Inc. v. Califano,*
   569 F.2d 674 (D.C. Cir. 1977) ............................................................... 42

*American Great Lakes Ports Ass'n v. Schultz*,
   962 F.3d 510 (D.C. Cir. 2020) ......................................................... 45, 52

*American Hosp. Ass'n v. Becerra*,
   2023 WL 143337 (D.D.C. Jan. 10, 2023) ............................................... 52

*American Lung Ass'n v. EPA*,
   985 F.3d 914 (D.C. Cir. 2021) ............................................................... 42

*Arizona Pub. Serv. Co. v. United States*,
   770 F.3d 1108 (4th Cir. 2014) ............................................................... 31

*AT&T Servs., Inc. v. FCC*,
   21 F.4th 841, 853 (D.C. Cir. 2021) ....................................................... 24

*CBOE Futures Exch., LLC v. Sec. & Exch. Comm'n*,
   77 F.4th 971 (D.C. Cir. 2023) ......................................................... 44, 49

*Cigar Ass'n of Am. v. FDA*,
   5 F.4th 68 (D.C. Cir. 2021) ............................................................. 15, 21

*Cigar Ass'n of Am. v. FDA*,
   315 F. Supp. 3d 143 (D.D.C. 2018) ....................................................... 13

*Cigar Ass'n of Am. v. FDA*,
   436 F. Supp. 3d 70 (D.D.C. 2020) ............................................. 14, 33, 48

*Cigar Ass'n of Am. v. FDA,*
    480 F. Supp. 3d 256 (D.D.C. 2020) .............................................. 15, 54

*Cigar Ass'n of Am. v. FDA,*
    964 F.3d 56 (D.C. Cir. 2020) ................................................ 14

*Comcast Corp. v. FCC,*
    579 F.3d 1 (D.C. Cir. 2009) ................................................ 46, 48

*Committee on Ways & Means v. United States Dep't of The Treasury,*
    575 F. Supp. 3d 53 (D.D.C. 2021) .......................................... 48

*Dakota Rural Action v. United States Dep't of Agric.,*
    668 F. Supp. 3d 1 (D.D.C. 2023) .......................................... 50

*Data Mktg. P'ship, LP v. United States Dep't of Lab.,*
    45 F.4th 846 (5th Cir. 2022) ............................................... 45

*Desoto General Hosp. v. Heckler,*
    766 F.2d 182 (5th Cir. 1985) ............................................... 41, 42

*Dickson v. Secretary of Defense,*
    68 F.3d 1396 (D.C. Cir. 1995) ............................................. 36

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ....................................................... 35

*Environmental Health Tr. v. FCC,*
    9 F.4th 893 (D.C. Cir. 2021) .............................................. 24, 37

*Environmental Integrity Project v. EPA,*
    425 F.3d 992 (D.C. Cir. 2005) ............................................ 34

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ....................................................... 37

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ....................................................... 6

*Fontem US, LLC v. FDA,*
    82 F.4th 1207 (D.C. Cir. 2023) ........................................... 34

*FTC v. Boehringer Ingelheim Pharms., Inc.*,
778 F.3d 142 (D.C. Cir. 2015) ............................................................ 21

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018) ............................................................ 24

*Good Fortune Shipping SA v. Comm'r of IRS*,
897 F.3d 256 (D.C. Cir. 2018) ............................................................ 29

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009) ............................................................ 46

*Home Box Off., Inc. v. FCC*,
567 F.2d 9 (D.C. Cir. 1977) ................................................. 24, 33, 40

*Humane Soc'y of U.S. v. Zinke*,
865 F.3d 585 (D.C. Cir. 2017) ............................................................ 39

*Lesesne v. Doe*,
712 F.3d 584 (D.C. Cir. 2013) ............................................................ 21

*Los Angeles v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999) ................................................ 24, 49, 50

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
70 F.4th 582 (D.C. Cir. 2023) ............................................................ 35

*Morall v. DEA*,
412 F.3d 165 (D.C. Cir. 2005) ............................................................ 46

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................... 30, 35, 40

*R.J. Reynolds Co. v. FDA*,
696 F.3d 1205 (D.C. Cir. 2012) ................................................... 40, 41

*Robinson v. NTSB*,
28 F.3d 210 (D.C. Cir. 1994) ............................................................ 25

*Senate Select Comm. on Pres'l Campaign Activities v. Nixon*,
498 F.2d 725 (D.C. Cir. 1974) ............................................................ 48

xi

*Sierra Club v. EPA*,
    863 F.3d 834 (D.C. Cir. 2017) .............................................................. 24

*Sluss v. U.S. Dep't of Justice, Int'l Prisoner Transfer Unit*,
    898 F.3d 1242 (D.C. Cir. 2018) .......................................................... 21

*Sorenson Commc'ns Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014) ...................................................... 24, 40

*Spirit Airlines, Inc. v. United States Dep't of Transportation & Fed. Aviation Admin.*,
    997 F.3d 1247 (D.C. Cir. 2021) ..................................................... 36, 37

*Standing Rock Sioux Tribe v. United States Army Corps of Engineers*,
    985 F.3d 1032 (D.C. Cir. 2021) ..................................................... 21, 44

*Stellar IT Sols., Inc. v. USCIS*,
    2018 WL 6047413 (D.D.C. Nov. 19, 2018) ................................. 24, 25

*Texas v. United States*,
    463 U.S. 29 (1983) ............................................................................. 45

*Waterkeepers Chesapeake v. FERC*,
    56 F.4th 45 (D.C. Cir. 2022) ........................................................ 44, 45

*Wedgewood Village Pharmacy v. DEA*,
    509 F.3d 541 (D.C. Cir. 2007) ..................................................... 45, 46

**Statutes**

Family Smoking Prevention and Tobacco Control Act,
    Pub. L. No. 111-31, 123 Stat. 1776 (2009)
    (codified at 21 U.S.C. § 387 et seq.) ..................................... 3, 4, 9, 38, 49, 51, 53

21 U.S.C. § 387d ............................................................................. 9, 53

21 U.S.C. § 387e ................................................................................. 53

21 U.S.C. § 387s ................................................................................. 51

**Regulations and Regulatory Releases**

*Regulations Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco Products to Protect Children and Adolescents*,
    60 Fed. Reg. 41,314 (Aug. 11, 1995) ..................................................................... 6

*Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Regulations on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*,
    79 Fed. Reg. 23,142 (April 25, 2014) .......................................... 6, 7, 14, 26, 28,
                                                                                32, 33, 34, 38, 39

*Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*,
    81 Fed. Reg. 28,974 (May 10, 2016) .......................... 2, 3, 7, 8, 9, 10, 19, 22, 23,
                                                                                27, 28, 29, 31, 32, 34, 39, 42

*Regulation of Premium Cigars*,
    83 Fed. Reg. 12,901 (March 26, 2014) ...................................... 10, 11, 26, 37, 47

*Requirements for Tobacco Product Manufacturing Practice*,
    88 Fed. Reg. 15,174 (March 10, 2023) ................................................................. 54

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| The Act | Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, 123 Stat. 1776 (2009) |
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| FDA | U.S. Food and Drug Administration |
| The Final Rule or The Rule | *Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, 81 Fed. Reg. 28,974 (May 10, 2016) |
| The Proposed Rule | *Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Regulations on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, 79 Fed. Reg. 23,142 (April 25, 2014) |
| JA | Joint Appendix |
| National Academies | National Academies of Sciences, Engineering, and Medicine |

**INTRODUCTION**

Using traditions passed from generation to generation, family businesses have husbanded the best tobacco, harvested it, aged it, and crafted it by hand into cigars for hundreds of years.  Because of the tobacco used and how they are made, these cigars are expensive.  They are sought by adults, from specialty, family-owned, corner-store tobacconists.  These handmade cigars long have been known as "premium cigars."

Then came the United States Food and Drug Administration.  In 2014, the FDA opened a rulemaking docket to decide whether to extend to other tobacco products a massive regulatory scheme that Congress built for cigarettes.  For premium cigars, the FDA's Proposed Rule recognized they were different than cigarettes and, indeed, other cigars.  They are not made by machines, they are made only from natural tobacco, their manufacturers generally are not international conglomerates, youth are not attracted to them, and their adult consumers do not abuse them.  So the FDA laid down the "central question" for determining whether or how to regulate premium cigars:  Whether they had different patterns of use that led to lesser health effects than other tobacco products?

Two years later, the FDA issued a Final Rule and subjected premium cigars to the same sweeping regulatory scheme as cigarettes.  In attempting to justify its decision, the FDA determined "there were no data provided to support the premise

1

that there are different patterns of use of premium cigars and that these patterns result in lower health risks." 81 Fed. Reg. at 29,020.

In a thorough opinion, the District Court held that this core conclusion was contrary to evidence in the administrative record. The record contained two federal Government-sponsored studies. They showed that premium cigar consumers used the products very infrequently (97 percent used them less than daily) and that smoking fewer than two cigars per day was not correlated with an increased risk of premature death. The District Court documented that the FDA did not analyze this evidence, much less address how its regulatory decision could be reconciled with it. Right in line with this Court's precedents, the District Court held this failure to be arbitrary and capricious. The decision to regulate premium cigars ignored contrary evidence in the record and did not respond to important comments.

On appeal, every one of the FDA's arguments either was not raised in the District Court or was comprehensively addressed by the District Court. With respect to that latter category, the FDA does not explain how the District Court might have erred in rejecting those arguments, instead choosing to repeat them as if they were a matter of first impression in this case. In the end, the FDA gives this Court no reason to reverse the District Court's well-reasoned decision.

## STATEMENT OF ISSUES

1.   Whether the District Court correctly held that the FDA's decision to regulate premium cigars violated the APA because the FDA failed to address evidence and comments directly responsive to a "crucial question" posed in the Proposed Rule?

2.   Whether the District Court abused its discretion by selecting the normal remedy of vacating the arbitrary and capricious decision to initiate FDA regulation of premium cigars?

## STATUTES AND REGULATIONS

Pertinent statutes not included in Appellant's brief and excerpts of the proposed and final rules at issue in this case are set forth in a separate Addendum.

## STATEMENT OF THE CASE

**I.   Premium Cigars Are Different Than Other Tobacco Products.**

In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("Act") to address specifically identified public health risks from cigarette and smokeless tobacco use.  81 Fed. Reg. at 28,974.  In turn, the Act erected a regulatory scheme tailored for those products.   In the case of cigarettes, it confronted a market with a few dozen offerings and mass-produced by mechanized assembly lines, which themselves were constructed by international corporate conglomerates.   Congress was concerned those products had been chemically manipulated and were being abused by youth.  Act §§ 2(4), (18) (31), (39), (49).

3

Congress made no decision on whether and how other tobacco products, including cigars, should be regulated, other than to authorize the FDA to address the question through reasoned rulemaking. Act § 901(b), (d). At the heart of that question was whether other tobacco products were used in ways similar to cigarettes and smokeless tobacco, presented corresponding public health problems, and merited the same regulatory solutions as those products, for which Congress mandated regulation.

One category of tobacco products—premium cigars—long had been regarded as different than other tobacco products. Premium cigars are carefully made by hand. They use whole-leaf tobacco grown in a handful of micro-climates capable of supporting the finest agronomy. For the United States market after the embargo on Cuba, these areas include the Dominican Republic, Honduras, Nicaragua, and the Connecticut River Valley. *See, e.g.*, JA35; JA39; JA533-34.

Because of the materials and work that go into their production, these handmade cigars are expensive. JA40; JA473. They are used very differently than cigarettes or even other cigars. JA98-99; JA469; JA493; JA526-27; JA548-49; JA566. Their consumers are adults and, among adults, tend to be older and higher income than consumers of other tobacco products. JA40; JA107; JA121; JA473; JA525. Those who do enjoy one of these handmade cigars typically do so very infrequently, perhaps to celebrate a special occasion. JA40; JA548. As detailed

4

further below, the evidence in the administrative record suggests that 97 percent of those who consume premium cigars do not use them daily.  JA439.  And the median premium cigar consumer uses the product fewer than two days a month.  *Id.*  These handmade cigars represent fewer than 3 percent of all the cigars sold in the United States, and 0.1 percent of all tobacco products.  JA91.

The way these cigars are made and consumed affects the types of businesses that manufacture and sell them.   Expert artisans and, in turn, premium cigar consumers look for the very best blend of tobacco from a particular growing season.  *See* JA36; JA41-43.  From the time the seed is planted to when it reaches a store takes up to five years; in that time, more than 300 hands touch the cigar.  Rocky Patel Decl. ¶12 (JA43); JA13.  The nature of how cigars are made lead to a wide variety of blends and brands that change from year to year.  *Id.*  Some manufacturers, thus, have hundreds of different cigar types.  JA41; JA43.

Premium cigar manufacturers tend to be small- to medium-sized businesses.  JA477; JA522.  They are often family-owned, drawing on the expertise of growing, selecting, aging, and finishing premium cigar tobacco passed down generation to generation.  JA35-38; JA39-44; JA488; JA522.  They do not have assembly lines, pushing out millions of units of the same product with per-product revenues that would support scientific research into each.  And they do not have general counsel offices capable of navigating a federal regulatory thicket.  JA312.

The cigars themselves are typically sold by corner-store tobacconists, where consumers can come see, handle, smell, and taste the latest blends. JA470; JA479; JA489-90; JA493; JA522. These tobacconists often are run by the same family for generations—who become specialized experts in understanding how the cigars are made, so they can make recommendations to their discerning consumers. JA41-42; JA478-79; JA522-23.

The FDA knew from the beginning that the manufacturing, retailing, consumer demographics, and usage patterns for premium cigars were different than other tobacco products. So when the agency proposed to regulate a range of tobacco products, including e-cigarettes and cigars,[1] it isolated the category of premium cigars and carefully set forth a framework for deciding whether and how they should be regulated. 79 Fed. Reg. 23,142, 23,150 (April 25, 2014). The FDA defined premium cigars as those made by hand, from whole leaf tobacco, without added artificial flavors, and bearing a certain weight per cigar, among other requirements. *Id*. at 23,150.

The FDA then laid out the key question that would drive the decision to regulate: Whether premium cigar usage patterns differ "from usage patterns of other

---

[1] Even considering regulating any cigars, much less premium cigars, was a change from the FDA's long-standing position—dating back to 1995—that cigars did not present sufficient public health issues to merit FDA regulation. 60 Fed. Reg. 41,314, 41,322 (Aug. 11, 1995); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) (vacating FDA rule regulating tobacco).

6

cigars" and whether those patterns have "the potential for varying effects on public health." *Id.* at 23,143; 23,150. As it later described this driving question, the FDA "specifically sought comment on how the potential different patterns of use of premium cigars might result in different or decreased health effects." 81 Fed. Reg. at 29,022. In asking the question, the FDA expressly referred to how often a premium cigar consumer uses the product. 79 Fed. Reg. at 23,151. It also noted the importance of getting the data right on whether there is any youth usage. *Id.* at 23,143; 23,150-51.

## II. Commenters Submit the Requested Evidence of Premium Cigars' Different Usage Patterns and Resulting Health Effects.

Premium cigar manufacturers and retailers took the FDA's question seriously. Relevant here, commenters submitted evidence that consumers were not abusing premium cigars to feed nicotine addictions, documenting that only a tiny fraction of premium cigar consumers used them on a daily basis. JA528-29; JA498-99; JA474; JA568; JA538. This included a 2014 Centers for Disease Control report entitled *Little Filtered Cigar, Cigarillo, and Premium Cigar Smoking Among Adults— United States, 2012–2013*, authored by FDA scientist Catherine Corey. JA436-440. Ms. Corey concluded that 97 percent of premium cigar consumers use the product less than every day and that the median consumer was using the product 1-2 times per month. JA436; JA438. Also submitted was a National Institutes of Health / National Cancer Institute study, *Cigars: Health Effects and Trends, Smoking and*

7

*Tobacco Control, Monograph No. 9*, JA328-410. That study concluded that smoking fewer than two cigars per day was not associated with a statistically significant increase in mortality or illness. *See* JA368.

The comment of Cigar Rights of America put these two studies together and drew the following uncontroversial conclusion: That nearly all premium cigar consumers use the product too infrequently to cause adverse health effects. JA529. Importantly, neither of these studies came flying in from left field: Both were commissioned and conducted by federal Government centers of scientific study— and one of them was led by one of the FDA's chief experts on tobacco regulation.

## III.  The Final Rule Ignored the Proposed Rule and Record Evidence.

In 2016, the FDA issued the Final Rule. To read the Final Rule, it was as if the Proposed Rule and the evidence submitted through the comment process never happened.

The FDA concluded that "there were no data provided to support the premise that there are different usage patterns with premium cigars and that these patterns result in lower health risks." 81 Fed. Reg. at 29,020. The FDA never addressed record evidence about how infrequently premium cigar consumers use the product and the lack of meaningful correlation between such infrequent use and adverse health outcomes.

The FDA further concluded that "premium cigars are used by youth." *Id.* at 29,020. According to the FDA, a study showed that "3.8 percent of youth aged 12 to 17" were using premium cigars. *Id.* at 29,023 (citing Cristine D. Delnevo, et al., *Preference for Flavoured Cigar Brands Among Youth, Young Adults and Adults in the USA*), JA320-27). But the FDA omitted the relevant population: Only 3.3 percent of those aged 12-17 used cigars at all. JA321. In other words, 3.8 percent of 3.3 percent of 12 to 17 year-olds—or about **0.1 percent** of such youths—might have used a premium cigar.

In the end, the FDA subjected premium cigars to the full panoply of regulations Congress and the agency had curated for cigarettes. Massive health warnings had to cover 30 percent of premium cigar boxes and advertisements. 81 Fed. Reg. at 28,988. Manufacturers were mandated to submit every one of the thousands of small-batch premium cigar blends introduced since 2007 to an FDA approval process similar to that for drugs or medical devices, replete with extensive health studies. *Id.* at 28,990-91. Companies had to test every single premium cigar type (which could be hundreds or thousands for each manufacturer) for what the agency regarded as "harmful, or potentially harmful [constituents]." *Id.* at 29,004; 21 U.S.C. § 387d(a). The record demonstrated that these tests may well cost $75,000 per product. JA479-480. For one family-owned manufacturer—Rocky Patel Premium Cigars—it would have cost almost $60 million to test its 3500 different

blends and sizes.  JA43.  The rule also required granular listings of products and their ingredients and snap inspections of factories and warehouses.  81 Fed. Reg. at 29,020; 29,072.  And, as detailed further below, it exposed premium cigars to new mandates the FDA was hatching for tobacco products subject to its regulatory scheme.

## IV.  The FDA Subsequently Acknowledged That Premium Cigars Are Different and That It Had Not Answered Key Questions in the Final Rule.

The FDA claims that the overlooked evidence is insignificant and FDA policymakers would have reached the same result if they had done the skipped analysis.  *See, e.g.*, FDA Br. at 5, 20, 33-36, 38-40.  That assertion is directly contradicted by the FDA's official actions in the wake of the Final Rule.

Before the most burdensome provisions of the Final Rule took effect, the FDA announced that it would reconsider whether and how premium cigars should be regulated.  JA146-47.  For that purpose, it delayed several compliance deadlines. JA146.

Nine months later, the agency opened a rulemaking docket for rethinking the regulation of premium cigars.  *Regulation of Premium Cigars*, 83 Fed. Reg. 12,901 (Mar. 26, 2018).  The FDA explained that new types of data had become available that were allegedly absent from the prior rulemaking record and that would have been material to its decision to regulate premium cigars.  *Id*. at 12,902-03.  Of particular importance was a study led by the same FDA scientist—Catherine

Corey—whose work on premium cigar consumers' infrequent use of the product was in the administrative record. *Id.* at 12,904 (citing Catherine G. Corey, et al., *U.S. Adult Cigar Smoking Patterns, Purchasing Behaviors, and Reasons for Use According to Cigar Type: Findings from the Population Assessment of Tobacco and Health (PATH) Study, 2013–2014*, JA148). Most important, the FDA said, was her conclusion that "those who smoked 'premium' cigars tended to report smoking them on fewer days compared with smokers of the other cigar types." 83 Fed. Reg. at 12,903. That directly tracked findings in Catherine Corey's 2014 study. JA436; JA438.

In January 2020, the FDA expressly concluded that premium cigars did not need to be regulated with the same measures and urgency applied to other tobacco products. It declared premium cigars—defined exactly in the way adopted by the District Court for its remedy in this case—the "FDA's lowest priority" for enforcement given "their comparatively lower youth usage rates." JA187.

The FDA then initiated its own research project to answer open questions crucial to whether to regulate premium cigars. Echoing the framing of questions in the Proposed Rule, paramount was whether, "given their use patterns, premium cigars pose *lower* risks to individual and public health than other tobacco products."

11

JA641 (emphasis added).[2]  The FDA again concluded that "youth smoke premium cigars comparatively less than most other deemed tobacco products, like e-cigarettes" and "premium cigars remain FDA's lowest priority for premarket review."  JA640-41.  Looking backwards, the FDA concluded that the record "to date—both in favor of and against regulation of premium cigars—have not provided new data sufficient to address questions of whether the characteristics of premium cigars or their usage patterns may result in different health effects than other tobacco products."  JA641.

For this research project, the FDA commissioned the National Academies of Sciences, Engineering, and Medicine.  In March 2022, the National Academies concluded that premium cigar consumers use the product very infrequently, very few use the product daily, and smoking two or fewer cigars per day was not associated with a statistically significant increase in mortality.  JA106-108, 113-14, 115, 117.  Importantly, the National Academies also determined there was no statistically significant usage of premium cigars by youth.  JA636.

---

[2] Citations to JA633-43 appear in the Supplemental Joint Appendix filed on April 15, 2024.

**V.    The District Court Consistently Held FDA's Treatment of Premium Cigars Arbitrary, While Upholding the Agency's Handling of Other Tobacco Products.**

Plaintiffs-Appellees are trade associations that count among their members companies that manufacture premium cigars, stores that specialize in selling premium cigars, and Americans who buy premium cigars.  The District Court took up the challenge to the Rule in phases as compliance dates for certain challenged aspects of the Rule approached.  Over the course of the case, the District Court held nearly 20 hours of oral argument.  Across the rulings in this case, the District Court consistently concluded that the FDA's treatment of premium cigars violated the APA.

At the same time, the case brought several claims against the regulation of non-premium cigars.  In resolving those claims, the District Court upheld many aspects of the Rule as applied to non-premium cigars (and thus 97 percent of the cigars sold in this country) and to pipe tobacco.

The first major compliance date concerned the requirement to place massive health warnings on cigar boxes.  The District Court rejected claims that the requirement, as applied generally to all cigars, violated the APA and the First Amendment.  *Cigar Ass'n of Am. v. FDA*, 315 F. Supp. 3d 143, 159-75 (D.D.C. 2018).

Addressing a separate claim specific to premium cigars, the District Court struck down the warnings requirement. *See Cigar Ass'n of Am. v. FDA*, 436 F. Supp. 3d 70, 86 (D.D.C. 2020). In that decision, the District Court diagnosed the FDA's persistent failure to follow through on answering crucial questions posed in the Proposed Rule or to explain why they were no longer important to answer. *Id.* Rather than addressing differences in the usage patterns and demographics of premium cigar consumers (issues on which the Proposed Rule sought comment), the FDA rested its decision to make premium cigar packages carry the same warnings on the Proposed Rule's conclusion that "all cigars are harmful and potentially addictive." *Id.* (citing 79 Fed. Reg. at 23,150). This reasoning was "circular." *Id.* at 86. Once it "fram[ed] the question that way, [in the Proposed Rule,] it was incumbent upon the agency to explain … why the health warnings regime was appropriate for the distinct category of premium cigar products." *Id.* at 89.

The District Court vacated the Final Rule's warnings requirement with respect to premium cigars. *Id.* at 90. The FDA did not appeal the District Court's ruling then and does not now. This Court later held the agency to have acted arbitrarily in crafting the warning requirement for all cigars. *Cigar Ass'n of Am. v. FDA*, 964 F.3d 56 (D.C. Cir. 2020). In the nearly four intervening years, the FDA has not even begun to take any action on remand.

14

When the FDA sought to enforce the Final Rule requirement that premium cigar manufacturers run many of their products through an FDA approval process similar to that for drugs or medical devices, the District Court held its application to premium cigars violated the APA. The District Court specifically faulted the agency's failure to follow through on key regulatory questions posed in the Proposed Rule, detailing that "[c]ommenters heeded the FDA's call" for evidence and proposals that supported a different regulatory approach to premium cigars but received no more than a "cursory response." *Cigar Ass'n of Am. v. FDA*, 480 F. Supp. 3d 256, 278, 280 (D.D.C. 2020). When the FDA "places an issue[] on the table," the District Court held that it is "'incumbent upon the agency' to address relevant, substantial comments to [that] effect." *Id.*

In the same opinion, the District Court turned back challenges to the premarket review requirement and other aspects of the Final Rule as applied to non-premium cigars. *Id.* at 281. This Court affirmed that decision. *Cigar Ass'n of Am. v. FDA*, 5 F.4th 68, 73 (D.C. Cir. 2021). The FDA did not appeal then, and does not appeal now, the District Court's decision overturning the premarket review process as applied to premium cigars.

The District Court then turned to the underlying decision to subject premium cigars to the broader regulatory scheme designed for cigarettes. The District Court held that decision to be arbitrary and capricious. *See* JA16. As it had in earlier

15

decisions, the District Court focused on the Proposed Rule and the specific issues identified by the FDA as important for comment and consideration. There, the "central consideration" was whether premium cigars, "because of how they are used, may have less of a public health impact than other types of cigars." JA20. The District Court held the FDA's handling of this key question "arbitrary," particularly the FDA's conclusion that there was *no evidence* submitted on the issue. JA29-30. To the contrary, there was record evidence showing a connection between less frequent use among premium cigar smokers and reduced public health risks, which the FDA failed to consider. JA21. The District Court pointed, in particular, to the 2014 study by FDA scientist Catherine Corey documenting less frequent use and the National Cancer Institute study detailing the lack of health effects associated with such use. JA22-23; JA25; JA29-30.

The District Court then turned to the question of who is and is not using premium cigars. The District Court held that, based on the FDA's recitation of the data, a "reasonable reader would not be off base in understanding [the agency] to imply that a more-than-negligible number of youth smoke premium cigars." JA32. In fact, as the District Court explained, the data actually showed "that only 3.8 percent of the only 3.3 percent of youth who reported smoking a cigar within the last 30 days, or 0.1 percent of all youth," may be smoking premium cigars. *Id.* The District Court appeared poised to find the FDA's addressing of youth usage a

16

violation of the APA but stopped short given other holdings sufficient to invalidate the decision to regulate premium cigars.  JA33; *see also* JA7.

 In a later opinion, the District Court held that vacating the Final Rule as applied to premium cigars was the appropriate remedy.  JA15.  Because the agency ignored relevant data on a "central question," the District Court found the errors sufficiently "serious" to warrant vacatur.  JA10.

The District Court also was unconvinced the FDA would make the same decision on remand, after grappling with the overlooked data, given the intervening FDA-commissioned research project "containing important findings" on the usage patterns question.  JA10.  And the District Court found other potential grounds for regulation as both connected to the errors on patterns of use and insufficient to absolve the FDA's failure to consider "an important aspect of the problem."  JA11.

The District Court then methodically marched through and rejected the FDA's claims of disruption from vacatur.  JA11-14.  The FDA raised concerns about the effects of certain Rule provisions not applying to premium cigars, but the District Court faulted the FDA for not presenting evidence that these provisions were addressing current problems with premium cigars.  JA12-13.  On youth usage, the District Court detailed State laws barring youth purchases.  JA12.  And the District Court made findings of the burdens of continuing regulation on premium cigar manufacturers and retailers, noting (among other things) that looming aspects of the

17

Rule were paralyzing them "from [investing] in new products, plants and employees." JA13.

## SUMMARY OF ARGUMENT

With the benefit of extensive briefing and lengthy hearings, the District Court correctly determined that the FDA's decision to regulate premium cigars was arbitrary and capricious in violation of the APA.

The District Court did not reflexively strike down the FDA's decision to regulate cigars. Instead, it upheld the Final Rule's application to non-premium cigars—representing 97 percent of the cigars sold in the United States—rejecting multiple challenges on behalf of those products. As applied to this sliver of handmade premium cigars, it successively struck down the Final Rule's warning requirement, premarket review mandate, and decision to subject premium cigars to the broader cigarette regulatory scheme.

The FDA appeals only the last of these rulings. But all three of the District Court's thorough decisions identify the same problem: The FDA had not followed through on answering what the Proposed Rule identified as key questions for determining whether and how to regulate premium cigars. In so doing, the FDA failed to address "important aspects of the problem" that the FDA itself had selected.

**I.** Relevant here, the Proposed Rule identified the key question as whether premium cigars were used differently in ways that lead to lesser health effects. In

the Final Rule, the FDA determined "there were no data provided to support the premise that there are different usage patterns with premium cigars and that these patterns result in lower health risks." 81 Fed. Reg. at 29,020. That blanket conclusion bypassed data in the administrative record that premium cigar consumers used the product very infrequently in a way not correlated with adverse health outcomes. The FDA "no data" conclusion ignored contrary evidence and failed to address comments casting doubt on the agency's preferred conclusion, both core APA violations under this Court's precedents.

Contrary to its arguments in this Court, the FDA's analysis in the Final Rule was not somehow close enough. The District Court was not, with the benefit of hindsight, elevating some issue as important and chiding the agency for not having written more. It was the FDA that recognized the issue of different premium cigar patterns of use (in general) and infrequency of their use (in particular) as important aspects of the problem.

Nor are general statements that "all cigar smoking is dangerous" the answer. The FDA's question, after all, was the *relative* health effects of premium cigars, given the differences is usage patterns. Making the existence of *any* adverse health effects the end of the discussion "moved the regulatory goal posts," without explanation—a type of agency action this Court consistently has struck down.

**II.**  There are other grounds for affirmance.  The District Court also found serious problems in the FDA's analysis claiming that youth are using premium cigars.  There, the FDA did not reveal that only 0.1 percent of those aged 12-17 might be using premium cigars.  Absent was any explanation of whether the Rule's massive regulatory burdens were justified for that small number, nor what the Rule could do to affect it in any meaningful way.

**III.**  The FDA's "no evidence" findings also improperly shifted the burden of justifying the Final Rule to the regulated.  In the rulemaking process and after, the FDA repeatedly has recognized that there are open questions as to premium cigar patterns of use—relevant to their regulation or not—that need answering.  Without explanation, however, the FDA illicitly let those lacunae in the record (if they were holes) default to massively burdensome regulation.

**IV.**  The District Court correctly vacated the Final Rule as applied to premium cigars.  The FDA makes no argument that the District Court abused its discretion in selecting this remedy.  And there is no basis for the extraordinary remedy of remand without vacatur.  The agency mishandled an important aspect of the regulatory problem.  And the Rule is causing massive disruption to family-owned premium cigar manufacturers and retailers.

## STANDARD OF REVIEW

In challenges to rules pursuant to the APA, this Court reviews *de novo* the rulings of the District Court. *See Cigar Ass'n of Am. v. FDA*, 5 F.4th 68, 74 (D.C. Cir. 2021). An appeal is no opportunity, however, for an agency to make fresh arguments defending a rule, as "issues and legal theories not asserted in the district court" are waived. *Lesesne v. Doe*, 712 F.3d 584, 588 (D.C. Cir. 2013). Even in APA cases, an appeal is focused on whether the district court erred in addressing the agency's arguments below. *Sluss v. U.S. Dep't of Justice, Int'l Prisoner Transfer Unit*, 898 F.3d 1242, 1247-48 (D.C. Cir. 2018).

After finding the APA violated, a District Court's decision to vacate an agency action may be overturned only for an abuse of discretion. *Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 985 F.3d 1032, 1051 (D.C. Cir. 2021). The question is not whether this Court would have selected a different remedy. *Id*. Moreover, the District Court's findings of fact relevant to selecting a remedy are reviewed only for clear error. *FTC v. Boehringer Ingelheim Pharms., Inc*., 778 F.3d 142, 148 (D.C. Cir. 2015).

## ARGUMENT

**I.    The District Court Correctly Determined that the FDA Mishandled the "Central Consideration" of Whether Premium Cigars Are Used Differently.**

The FDA itself set the principles that should guide the decision whether and how to regulate premium cigars. The "central question" was whether there were

21

different patterns of use for premium cigars and whether those patterns led to lesser health effects.    JA29; *see also* JA10.    The FDA arbitrarily and capriciously mishandled that issue, in violation of the APA.

### A.    The District Court Correctly Held that the FDA Arbitrarily Ignored Evidence Contrary to its Conclusion.

The FDA asserted that there were "*no data* provided to support the premise that there are different usage patterns for premium cigars and that these patterns result in lower health risks."  81 Fed. Reg. at 29,020 (emphasis added); *see also id*. at 29,024 (reaching the same conclusion).  The District Court correctly held that the FDA's "no data" determination erroneously bypassed evidence in the administrative record that addressed a question the FDA itself identified as "central" in the Proposed Rule, and thus was arbitrary and capricious in violation of the APA.  JA29-30.  Breaking no new legal ground, the District Court held that, when "an agency speaks in absolute terms that there is no evidence, it acts arbitrarily and capriciously when there is in fact pertinent record evidence and the agency ignores or overlooks it."  *Id.*

In its brief, the Government does not meaningfully contest that there was evidence in the administrative record contrary to its "no data" conclusion.  *Id.*  The District Court highlighted two studies.  The first was a 2014 study by FDA scientist Catherine Corey, documenting that, of the 1.45% of American adults who consume premium cigars, only 3.3% of that limited group do so daily.  JA438.  This provided

evidence, the District Court explained, that "only a small fraction of survey respondents who identified themselves as premium cigar users admitted to smoking on a daily basis." JA22. The second was the National Cancer Institute's Monograph 9, showing "no statistically significant" effect on mortality for those "who smoked no more than two cigars per day." JA22 (citing AR130342-43); *see also* JA7 n.3.

The District Court was not demanding some unfair "connect the dots" effort from the agency, because the comment of the Plaintiff Cigar Rights of America did that work. JA25 (citing JA529 (the comment)). At least 97 percent of premium cigar consumers were using the product in a manner not associated with adverse health effects. JA438; JA368; JA529. To add insult to injury, the FDA admonished commenters for not having submitted any of the above evidence, explaining in the Final Rule that it had "specifically sought comment on how the potential different usage patterns for premium cigars might result in different or decreased health impacts, *but no such evidence was submitted*." 81 Fed. Reg. at 29,022 (emphasis added).

The District Court's holding the FDA's failure to address this evidence as arbitrary and capricious was right in line with this Court's precedents enforcing the APA.

First, an agency cannot ignore evidence in the administrative record contrary to its conclusions. *Environmental Health Tr. v. FCC*, 9 F.4th 893, 907 (D.C. Cir.

2021) ("[A]n agency cannot simply ignore evidence suggesting that a major factual predicate of its position may no longer be accurate."); *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (agency cannot "ignore evidence contradicting its position"); *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 709 (D.C. Cir. 2014) (failure to consider evidence in the record questioning the efficacy and necessity of rule is arbitrary).

Second, the agency cannot bypass "comments which, if true, [. . .] would cast doubt on the reasonableness of the decision taken by the agency." JA25 (*citing Home Box Off., Inc. v. FCC*, 567 F.2d 9, 36 n.58 (D.C. Cir. 1977)); *Sierra Club v. EPA*, 863 F.3d 834, 838-39 (D.C. Cir. 2017). After all, "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *AT&T Servs., Inc. v. Fed. Commc'ns Comm'n*, 21 F.4th 841, 853 (D.C. Cir. 2021).

Third, where an agency speaks in absolute terms about the absence of evidence, its action is arbitrary and capricious when the evidence does, in fact, exist in the administrative record. *See Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) ("[T]o say that she had 'no evidence. . . runs counter to the evidence before the agency' and is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."); *Stellar IT Sols., Inc. v. USCIS*, 2018 WL 6047413, at *9 (D.D.C. Nov. 19, 2018) ("[T]he agency cannot base its decision on a supposed lack of evidence when evidence was not actually lacking."); *Robinson*

24

*v. NTSB*, 28 F.3d 210, 216 (D.C. Cir. 1994) (agency acted arbitrarily when it asserted there was no evidence of a proposition, but the administrative record showed there was).

### B.    The FDA Does Not Meaningfully Assign Error to the District Court's Opinion Determining the APA Had Been Violated.

When reviewing the decision of a district court, this Court's primary task is to detect and to correct errors in the District Court's analysis and resolution of the case. Absent from the FDA's brief, however, is any sustained effort to critique the District Court's specific reasoning in rejecting FDA's similar arguments below. Instead, the Government offers only a high-level defense of the FDA's Final Rule, effectively telling the Court that the FDA's reasoning was good enough and the defects identified by the District Court can be ignored. *See, e.g.,* FDA Br. at 35.

### 1.

At several points, the Government contends that the District Court was missing the forest for the trees. If it did glide over the evidence that premium cigar consumers use the product very infrequently, the FDA claims it did so only because the issue was not important; everything was part of the agency exercising its expert judgment to assign "weight" to scientific evidence. FDA Br. at 34.

Contrary to the FDA's suggestion, the District Court was not quibbling with an expert agency about what types of evidence are important. Instead, both the District Court and those challenging the Rule were taking the FDA at its own word,

as the FDA itself determined *in the Proposed Rule* that whether premium cigars had "different patterns of use" than other tobacco products that led to lesser health effects was the pivotal question that would drive its regulatory decision. 79 Fed. Reg. at 21,143, 23,150-51; JA20-21. Leaving no doubt about the importance of this particular evidence, the Proposed Rule specifically pointed to the frequency with which the product is used as an important issue. *Id.* at 23,151.

Claims that such frequency data is unworthy of analysis or irrelevant to the regulatory outcome also cannot be squared with the FDA's later actions. After all, the agency subsequently opened a new rulemaking docket to address "evidence [and] data . . . that were not submitted in response to the proposed deeming rule" that should "inform FDA's thinking about the regulation of premium cigars." 83 Fed. Reg. at 12,902. The FDA said the paradigmatic example of such evidence was a 2017 study by the same author (FDA scientist Catherine Corey), reviewing the same questions, and reaching almost identical conclusions as the 2014 study on frequency of premium cigar use that was in the administrative record. *Id.* at 12,902-03 (citing "REF 1", the later, 2017 Corey Study at JA148-155). The key and common conclusion: Premium cigar consumers use them "on fewer days compared with smokers of other cigar types." *Id.* at 12,903.

**2.**

Second, the FDA claims it somehow actually addressed the record evidence that those who consume premium cigars do so infrequently, citing references in the Final Rule to assertions that premium cigars are used infrequently.  FDA Br. at 27-28.

The District Court analyzed each of the cited Final Rule passages.  Yet the FDA's brief does not even mention the District Court's reasoning.  As the District Court explained, the Final Rule observed that commenters claim that premium cigar consumers use the product "less frequently" and do not inhale, but the analysis that follows focuses only on the lack of inhalation, never grappling with studies documenting the infrequency with which premium cigar consumers use the product. JA26-28 (citing 81 Fed. Reg. at 29,024-25); *see also* FDA Br. at 27-28 (summarily stating that the same passage shows FDA analysis of the frequency data).

In addition, when the FDA refers to claims that "premium cigar smokers use cigars less frequently than cigarette and smokeless tobacco users," the context shows that the FDA was addressing the percentage of the population overall who use cigars. 81 Fed. Reg. at 29,025; *see also* FDA Br. at 31-32.  That is the so-called "prevalence" of cigar use, not the frequency with which a cigar consumer uses the product.  81 Fed. Reg. at 29,025.

27

The FDA also now refers this Court to a passage describing a 2014 Surgeon General's Report observing that "those who use a pipe or cigar usually smoke at a lower frequency." FDA Br. at 24 (quoting 81 Fed. Reg. at 29,022). But that passage concerned "pipe and cigar" consumers generally, as "compared with persons who smoke cigarettes." 81 Fed. Reg. at 29,022. That reference has nothing to do with the "central consideration" in the Proposed Rule as to whether premium cigars are characterized by different "patterns of use" than other cigars. JA20-21 (citing 79 Fed. Reg. at 23,150). On that question, the Surgeon General had nothing to say. But FDA scientist Catherine Corey did study the issue, and the Final Rule does not address the data she gathered or her conclusions. Instead, the FDA repeatedly laments that it "specifically sought comment on how the potential for different usage patterns for premium cigars might result in different or decreased health impacts, but no such evidence was submitted." 81 Fed. Reg. 29,022.[3]

---

[3] The Government points to the Final Rule referencing the Corey study and Monograph 9 study multiple times as evidence the FDA grappled with the Proposed Rule's use and frequency questions. FDA Br. at 28. The FDA cited the Corey study, however, for points completely unrelated to frequency of use, namely: the dual use of cigars and other tobacco products and percentage of adult cigar consumers who use premium cigars. 81 Fed. Reg. at 29,022-23. And the FDA cites Monograph 9 for issues related to second hand smoke and the comparison of cigars generally to cigarettes, not the health effects of using less than 2 cigars per day. 81 Fed. Reg. at 29,020-25.

The Government's assertions that FDA policymakers were aware of the 2014 Corey Study, considered its conclusion on frequency of use related to health risks, and dismissed it are further undercut by intervening developments. FDA Br. at 24-25, 28-30, 31-32. In its 2018 opening of a rulemaking to rethink its regulation of premium cigars, FDA officials explained at length that a subsequent study by the same FDA scientist and presenting the same conclusions was the type of "data and analysis that were not submitted in response to the proposed deeming rule." And the backward looking statements of FDA policymakers, explicitly acknowledging that they were missing data of a certain type when concluding the rule, block agency litigation counsel arguments speculating to the contrary. *See Good Fortune Shipping SA v. Comm'r of IRS*, 897 F.3d 256, 264-65 (D.C. Cir. 2018) (rejecting agency litigation counsel arguments about what happened in a historical agency decision when inconsistent with later official actions).

### 3.

Third, the Government repeats arguments made below that the full burdens of FDA regulation are justified for premium cigars because 3.3 percent of premium cigar consumers—a number the FDA now calculates to be 120,000 Americans—use the product daily. FDA Br. at 31-32 & n.7. But the FDA's brief, again, assigns no error to the District Court's thorough analysis rejecting the same argument. In legal arguments to the District Court, the FDA came up with the exact same number.

JA24.  But that math does not appear in the Final Rule, and is the type of *post hoc* justification forbidden under *Chenery*.  *Id.*  And, in the Final Rule, "the agency never explained why that number still merited" imposing a massive regulatory scheme on premium cigar manufacturers or what that scheme would do to address that discrete population.  *Id.*; *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agencies must define the regulatory problem and explain how the scheme will alleviate it).

In general, the FDA brief is rife with litigation counsel's analyses of the missed studies—and how they might actually support regulation—that were absent from the Final Rule.  *See*, *e.g.*, FDA Br. at 29, 31 (attempted reinterpretations of Monograph 9).  As did the District Court, this Court should reject these belated efforts to backfill the agency's missing reasoning.  *See* JA23; *State Farm*, 463 U.S. at 50.

**4.**

Fourth, the FDA suggests it had other grounds, beyond its conclusions about the absence of evidence of different premium cigar usage patterns, to throw these products into the regulatory scheme designed for cigarettes.  FDA Br. at 26.  Among them, the FDA says, is its one-sentence conclusion that "current use patterns" are irrelevant because "the patterns may change over time and in response to regulation."  81 Fed. Reg. at 29,025.  The District Court dispatched this argument,

30

concluding that one-sentence speculating about "the mere possibility of a change in behavior is not reasoned decisionmaking." JA28-29. "Mere conjecture and abstract theorizing" do not suffice under the APA. *Id.* (quoting *Arizona Pub. Serv. Co. v. United States*, 742 F.2d 644, 649 n.2 (D.C. Cir. 1984)). And the agency's summary conclusion lacks the hallmarks of reasoned decisionmaking, including establishing an accurate baseline for current premium cigar usage patterns, explaining why and in what direction the patterns were likely to change, and addressing why the solution is not initiating regulation when there is data that the patterns have changed.

The FDA also asserts that its policymakers undoubtedly would have regulated premium cigars (even if fully apprised of the record evidence) because they also decided to regulate allegedly less harmful e-cigarettes. FDA Br. at 34-35. This generalized speculation ignores, however, the many specific reasons the FDA gave for regulating e-cigarettes, including a spate of youth usage and mysteries about the chemicals that make up vaping liquids, an issue that the regulation's mandated scientific testing of each product type would directly address. 81 Fed. Reg. at 28,984; 29,003; 29,029; 29,035.

### 5.

Fifth, the FDA wants the Court to focus on other parts of the Final Rule, where it contends it correctly stated its reasoning. To begin, the FDA points to the following statement in the Final Rule: "The available evidence does not provide a

31

basis for FDA to conclude that the patterns of premium cigar use sufficiently reduce the health risks to warrant exclusion" from its broad proposed regulatory scheme. FDA Br. at 24 (quoting 81 Fed. Reg. at 29,020). That is no salvation for the agency, because the conclusion has an expressly stated minor premise: That there was "no evidence that the premium cigar patterns of use reduce health risks" *at all*. In reaching this determination, the FDA did not evaluate key evidence in the record on the key issue where it sought comment: How often premium cigar consumers use the product.

The FDA next turns to Final Rule statements that all tobacco products can produce some negative health effects. FDA Br. at 11-22, 24-25 (citing 81 Fed. Reg. 29,020; 29,022; 29,025). The District Court addressed this argument in its thorough opinion. It explained that statements like "use of cigars still presents health risks" and "all cigars produce toxic cigar smoke [are] exactly the sort of nonresponsive, circular reasoning the court faulted previously." JA26. That is because the Proposed Rule accepted those statements as truisms and did not seek comment on them at all. *See, e.g.*, 79 Fed. Reg. 23,143 ("FDA recognizes that all cigars are harmful and potentially addictive[.]"). Instead, the FDA sought comment on the "central consideration" of whether premium cigars have different "patterns of use" that can lead to "varying [or lesser] effects on public health" than other tobacco products. *Id.* at 23,150-51; JA20-21. "Simply reprising that 'all cigars produce toxic cigar

32

smoke'" or that all cigar use is dangerous, the District Court correctly held, "does nothing to respond to the commenters or otherwise develop the conversation as required by the APA." JA27. As the District Court held earlier, once the Proposed Rule "framed the question"—here of different patterns of use leading to lesser health effects—it "became incumbent on the agency to address" it in the Final Rule. *Cigar Ass'n*, 436 F. Supp. at 85.

What the District Court diagnosed was the FDA's undermining of the notice and comment rulemaking process that lies at the heart of the APA and its system of agency accountability. The notice-and-comment process, after all, requires an "exchange of views, information, and criticism between interested persons and the agency." *Home Box Off.*, 567 F.2d at 35.

That did not happen here. The FDA started the rulemaking process with a premise—that all cigar smoking has health risks—that was expressly insufficient to make the regulatory decision. And then the agency reverted to that same assertion and based the Final Rule on it, without addressing the evidence submitted in the comment process. If this type of reasoning were adequate under the APA, businesses, consumers, and citizens might as well save their resources and skip the comment process entirely. Perhaps administrative agencies would prefer that, but Congress denied agencies that unfettered authority. Before unelected bureaucrats make major decisions upending businesses and livelihoods, they must seriously

engage with the evidence submitted in response to the questions posed at the beginning of the rulemaking process.

Nor does it help the FDA to turn to Final Rule statements finding a lack of evidence "that premium cigar users are *not susceptible* to health risks" or "*not subject* to disease risk and addiction," FDA Br. at 33 (citing 81 Fed. Reg. at 29,020 & 29,024) (emphasis added).  The Proposed Rule did not say the regulatory decision should turn on whether there are *any* health effects associated with premium cigars.  Instead, the question was whether different patterns among consumers of premium cigars led to "varying effects on public health."  79 Fed. Reg. at 23,150.

Through the statements now cited by the FDA, the agency moved the "regulatory goalposts"—changing the fundamental regulatory inquiry between the Proposed and Final Rules—"without explanation."  *Fontem US, LLC v. FDA*, 82 F.4th 1207, 1222 (D.C. Cir. 2023).  That is "arbitrary and capricious."  *Id.*; *see also Environmental Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) ("[W]e have refused to allow agencies to use the rulemaking process to pull a surprise switcheroo on regulated entities.").

For an agency to make such a midcourse change, it must at least acknowledge the change and *explain why* it is changing the standard or position.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016); *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023) (finding agency

34

acted arbitrarily and capriciously by "display[ing] no awareness of its own flip flop"). *That did not happen here.*

And the shift would have been difficult to explain, had the agency even tried. The question was whether the FDA should impose on premium cigars *a detailed regulatory scheme that Congress designed for cigarettes*. Contrary to the FDA's arguments (FDA Br. at 1, 6, 26, 40), Congress did not ordain this scheme for all tobacco products; it left whether the scheme fit other tobacco products to decisionmaking through regulation. Thus, whether premium cigars are made and used in similar ways to cigarettes was a crucial question. It went straight to identifying the regulatory problem and demonstrating whether the proposed regulations would address it. *See*, *e.g.*, *State Farm*, 463 U.S. at 43. With premium cigars, expensive chemical testing and scientific FDA approval of each premium cigar blends were already mismatches with how they were made—of whole leaf tobacco, in many varieties, and by hand. Against this backdrop, whether premium cigars' different patterns of use created a regulatory need for these measures was all the more important. The agency shifting the dispositive standard for determining whether and how to regulate, *sub silentio*, was thus all the more arbitrary.

On test day, students cannot just answer math questions; they have to "show their work." Nothing less is expected of our administrative agencies. After all, their

answers are not academic.  They can devastate family businesses, as the Final Rule was poised to do.

### C.    The District Court Did Not Supplant the FDA's Asserted Scientific Expertise or Analysis.

The FDA claims that the District Court's decision assaulted some concept of deference on the interpretation of scientific studies afforded allegedly expert agencies.  FDA Br. at 34.

The FDA is missing the point of the District Court's opinion.  The District Court was not nitpicking at careful scientific analysis.  Rather, the District Court determined there was no analysis or judgment made by the agency to second guess in the first instance.    JA26-27.    That is a blatant failure of transparency, accountability, and explanation—all required of agencies by Congress through the APA.  *Spirit Airlines, Inc. v. United States Dep't of Transp.*, 997 F.3d 1247, 1256 (2021).

The cases cited by the Government to defend the FDA's actions make this clear.  The FDA enlists this Court's decision in *Dickson v. Secretary of Defense*, 68 F.3d 1396 (D.C. Cir. 1995), and quotes the aphorism that an agency's decision "[need not] be a model of analytic precision to survive a challenge." *Id.* at 1404; FDA Br. at 34.  The FDA omits what this Court did next:  It faulted the agency for failing to explain how it evaluated and analyzed relevant data in the record, instead "list[ing] the facts and stat[ing] its conclusions, but [] not connect[ing] them in any

36

rational way." *Id.* at 1407. While an agency can "brush[ ] off record evidence," it must "provide a reasoned explanation" for doing so, or else it has acted "arbitrarily and capriciously in violation of the APA." *Environmental Health*, 9 F.4th at 908-09.

Nor did the District Court simply disagree with the "weight" the agency assigned to a piece of record evidence. FDA Br. at 34 (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 424-25 (2021)). First, the District Court determined that the agency acted arbitrarily because it did not put record evidence on the scale to begin with. JA23-25, 29-30; *see also Spirit Airlines*, 997 F.3d at 1255 (noting that the agency "gave no indication it even considered" contradictory evidence and as such could not demonstrate it "grappled with an important aspect of the problem").

Second, the FDA itself said the Corey study—and data about the different frequency with which premium cigar consumers use the product—was important. *See* 83 Fed. Reg. at 12,903. This is not a case where commenters are building haystacks of data and then, after the fact, reviewing courts are faulting agencies for missing a needle in those haystacks. Rather, the agency skipped data directly responsive to what the agency sought in the Proposed Rule: Information about patterns of premium cigar use different from other tobacco products, specifically the frequency with which they are used. 79 Fed. Reg. at 23,151.

## II.    The FDA's Evaluation of Youth Usage Was Arbitrary and Capricious in Violation of the Administrative Procedure Act.

The District Court found problems in the FDA's evaluation of whether and to what extent youth use premium cigars.  Contrary to the FDA's suggestion (FDA Br. at 16-17), the District Court "did not need to make an arbitrary and capricious finding because it had already found" the decision to regulate premium cigars "unlawful." JA7.  The FDA's errors regarding youth use, however, provide an alternative ground of affirmance.

The incidence of youth using tobacco products, and how regulation will reduce it, was Congress's number-one focus when passing the Family Smoking Prevention and Tobacco Control Act.  Congress's first legislative finding in the Act was that "[t]he use of tobacco products by the Nation's children is a pediatric disease of considerable proportions that results in new generations of tobacco-dependent children and adults."  Act § 2(1).  The first express purpose of the Act was "to ensure that the [FDA] has the authority to address issues of particular concern to public health officials, *especially the use of tobacco by young people . . . .*"  Act § 3(2).  The FDA also set forth "differences in [premium cigars'] effects on youth initiation and the frequency of their use by youth" as key questions for determining whether to regulate them.  79 Fed. Reg. at 23,150.

The statute and the Proposed Rule, therefore, plainly made whether youth are using a tobacco product and whether the proposed regulatory measures could

38

meaningfully reduce that use an "important aspect of the problem" in determining whether or how to regulate it. *See*, *e.g.*, *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017).

In the Final Rule, the FDA concluded that "studies indicate that [youths] are also using premium cigars." 81 Fed. Reg. at 29,022. For this proposition, the FDA cited a study authored by Cristine Delnevo. *Id.* at 29,023. The FDA said the study's "analysis reveals that 3.8 percent of youth aged 12 to 17 . . . also identified certain premium cigars to be the brand they smoked most often." *Id.*

What the FDA omits is that the study found that only 3.3 percent of youth had used cigars at all and that it was 3.8 percent of that small group that had used premium cigars. JA31; JA321 (Table 1). Even on the terms of the FDA's own analysis, therefore, roughly 0.1 percent of those aged 12-17 had ever used a premium cigar. JA31.

The FDA also misrepresents the record by saying the study "clearly indicate[s] that youth and young adults are using premium cigars." FDA Br. at 18, 26 (quoting 81 Fed. Reg. at 29,023). In fact, the authors of the cited study made no conclusion at all regarding whether youth are consuming premium cigars. JA320-26.

A cavalcade of APA violations follows.

39

First, the Final Rule "obscures the real math." JA31. As the District Court explained, the FDA's statement could mislead the reasonable reader to understand that a "more-than-negligible number of youth smoke premium cigars." JA32. And the FDA never explains how the *0.1 percent of youth* that may be using premium cigars is worth casting family-owned, premium cigar manufacturers into a devastatingly expensive regulatory scheme.

In so doing, the FDA failed both reasonably to define the regulatory problem and to explain how the proposed regulatory scheme would alleviate it. *See State Farm*, 463 U.S. at 43 (agency must reasonably explain why there is a "regulatory problem" and how the proposed regulatory scheme would address it). A "regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist." *Home Box Off.*, 567 F.2d at 36 (citations omitted). This Court overturns rules "intended to defeat a bogeyman whose existence was never verified." *Sorenson*, 755 F.3d at 710.

In a similar vein, the FDA keeps making the same mistake, as this Court previously has faulted the agency for failing to deal properly with incredibly small numbers. *R.J. Reynolds Co. v. FDA*, 696 F.3d 1205, 1220-21 (D.C. Cir. 2012). So, when studies in *R.J. Reynolds* showed FDA-mandated graphic warnings for cigarettes might reduce use by 0.088 percent, this Court struck the rule down because the agency did not explain how any progress would be distinguishable from zero.

40

*Id.* at 1220.  Here, the error is worse:  The agency did not explain how the incidence of behavior it wishes to curb was distinguishable from zero, much less how its regulatory scheme would meaningfully change any of that almost imperceptible behavior.

Second, the FDA cobbled together its own statistic from the underlying data tables of a study that was intended to "assess preference for *flavoured cigar brands* among youth, young adults and adults" and did not reach any conclusions about youth *premium cigar* usage.  JA323 (emphasis added); *see also* JA320 (examining "use of flavoured cigar brands"); JA321 ("primary focus was on demographic patterns of flavoured cigar use").  Appropriately so, as a subsequent study determined that the incidence of youth consuming premium cigars is so small, that it is statistically indistinguishable from zero.  Karin A. Kasza, et al., *Tobacco-Product Use by Adults and Youths in the United States in 2013 and 2014*, THE NEW ENGLAND JOURNAL OF MEDICINE (JA233-34).  Agencies that draw conclusions from studies constructed for another purpose or without mentioning the studies' key qualifications act arbitrarily.  *See Desoto General Hosp. v. Heckler*, 766 F.2d 182, 185-86 (5th Cir. 1985) (rule arbitrary and capricious where based on a study that was commissioned for other purposes); *Almay, Inc. v. Califano*, 569 F.2d 674, 682 (D.C. Cir. 1977) (regulation arbitrary when based upon a single "flawed survey"

limited in population sample, silent in important respects, and reflecting other critical limitations).

III. **The FDA's Treatment of Usage Patterns and Youth Use Are Both Examples of the Agency Inappropriately Shifting the Burden For Justifying a Regulation to the Regulated.**

When an agency sets out to regulate an entire industry for the first time, the APA places the "burden of justif[ying]" the regulation *on the agency*. *American Lung Ass'n v. EPA*, 985 F.3d 914, 993 (D.C. Cir. 2021), *rev'd on other grounds by West Virginia v. EPA*, 597 U.S. 697 (2022).

With regard to premium cigars, the FDA had the process and the burden of justification exactly backwards. The FDA expressly acknowledged—in the Proposed Rule, in the Final Rule, and in subsequent agency pronouncements—that there are significant open questions about how premium cigars are being used and by whom that would materially affect whether and/or how to regulate premium cigars. It then repeatedly (and erroneously) chided commenters for the absence of evidence in the record on these issues. *See* 81 Fed. Reg. at 29,022. The FDA, like the EPA in *American Lung Association*, "seemed to forget that it even had a burden of justification under the APA, going so far as to suggest that the obligation was somehow on the *commenters* to show that" regulation is unwarranted. 985 F.3d at 993.

42

The FDA should have studied these open questions and assembled that evidence and then made a regulatory decision based upon it *before* subjecting an industry to new and highly burdensome regulation. That is what the APA demands; the FDA's contrary course was arbitrary and capricious.

The FDA's error is confirmed in its subsequent statements regarding the regulation of premium cigars. After it opened a rulemaking acknowledging that new data relevant to whether and how the FDA should regulate premium cigars has come to light, the FDA observed that the record "to date—*both in favor of and against regulation of premium cigars*—have not provided new data sufficient to address questions of whether the characteristics of premium cigars or their usage patterns may result in different health effects than other tobacco products." *See* JA641 (emphasis added). The FDA then decided it was incumbent on the agency to run those questions to ground and commissioned the National Academies of Science, Engineering, and Medicine to do so. JA73-121. It clearly is. But what the FDA never has explained is why premium cigars should be subject to crushingly expensive regulation in the meantime.

This is especially so when an obviously crucial question is whether the premium cigars patterns of use are sufficiently similar to cigarettes to justify a burdensome scheme designed to combat the particular ills of cigarettes. *See* Section I.B.5 *supra*.

43

**IV.    The District Court Did Not Abuse Its Discretion by Vacating the Decision to Regulate Premium Cigars.**

**A.    The FDA Does Not Even Argue That the District Court Abused Its Discretion by Ordering Vacatur.**

"[V]acatur is the normal remedy" when a court identifies an APA violation. *Cboe Futures Exch., LLC v. Sec. & Exch. Comm'n*, 77 F.4th 971, 982 (D.C. Cir. 2023); *Waterkeepers Chesapeake v. FERC*, 56 F.4th 45, 49 (D.C. Cir. 2022); *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). In cases proceeding on appeal, a District Court's vacatur of an agency action for violating the APA may be overturned only for an abuse of discretion. *Standing Rock*, 985 F.3d at 1051. The reviewing court "may not 'substitute [its] judgment for that of the trial court, so [it] cannot decide the issue by determining whether [it] would have reached the same conclusion.'" *Id.*

Because of this demanding standard, undersigned counsel is not aware of any instance in which this Court has reversed the District Court's selection of a vacatur remedy for a rule held to be arbitrary and capricious.

The FDA provides no reason for breaking new ground in this case. The agency provides several reasons why it believes remand without vacatur would be "proper," "appropriate," and "warranted." FDA Br. at 37, 40. Those are arguments for this Court to substitute its own judgment for the District Court's and not enough under the abuse-of-discretion standard. That shortcoming is dispositive of this issue

44

on appeal. *See Texas v. United States*, 798 F.3d 1108, 1115-16 (D.C. Cir. 2015) (appellants forfeit arguments not made in their opening brief); *see also Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 860 (5th Cir. 2022) (upholding vacatur because "[t]he Department ma[de] no developed argument that the district court abused its discretion in following the default rule [of vacatur]," and therefore "forfeited the argument").

### B. Vacatur Is the Appropriate Remedy.

Remand without vacatur is "an exceptional remedy," that is available only "in limited circumstances." *American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518-19 (D.C. Cir. 2020). Whether a court vacates an unlawful administrative action "depends on [1] the seriousness of the [rule's] deficiencies . . . and [2] the disruptive consequences of an interim change that may itself be changed." *Waterkeepers Chesapeake*, 56 F.4th at 49.

### 1. The District Court Correctly Determined that the FDA's Errors Were Serious.

The District Court did not abuse its discretion in finding the errors rendering the FDA's decision to regulate premium cigars arbitrary and capricious to be serious. Agencies make serious errors and their decisions are vacated when they "entirely fail[] to consider an important aspect of the problem." *Wedgewood Village Pharmacy v. DEA*, 509 F.3d 541, 549 (D.C. Cir. 2007) (quoting *Morall v. DEA*, 412 F.3d 165, 177 (D.C. Cir. 2005)). Likewise, this Court has "not hesitated to vacate a

45

rule when the agency has not responded to empirical data or to an argument inconsistent with its conclusion." *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009). Here, the District Court correctly held that the FDA committed both of these serious errors by ignoring relevant data on the "central question" the agency faced. JA10.

The FDA makes no meaningful effort to suggest its errors are not within the categories of those regarded serious enough for vacatur. Instead, the agency's litigation counsel urges remand without vacatur on the prediction that FDA policymakers inevitably will just patch up the agency's errors and reach the same conclusion on remand. FDA Br. at 38-39. Contrary to the FDA's claims, this is not some simple "defect in explanation" that "can be readily cured." *Id.* at 38 (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009)). Hardly around the margins of the question, the District Court held that the FDA failed to analyze "an important aspect of the problem," a defect the District Court was well within its discretion to address through vacatur. JA9-10. And bypassing an "important aspect of the problem" cannot be forgiven by later "amplifying" other bases for the Rule. FDA Br. at 39. That is especially so here, where the District Court explained that additional attempted justifications regarding second-hand smoke and dual use of cigars and other tobacco products "cannot be divorced from the central failure to consider data on usage patterns and health effects." JA11.

Moreover, virtually everything that FDA policymakers have done since issuing the Final Rule contradicts its assertion that it will inevitably and quickly reach the same conclusion on remand. A little over a year after the Final Rule, the FDA officially announced that it was taking another look at whether and/or how premium cigars should be regulated and suspended all regulatory deadlines. JA145. Thereafter, it opened a rulemaking docket for that purpose, highlighting what it characterized as new evidence about the very issue on which the District Court faulted the agency's prior reasoning: The frequency with which premium cigar consumers use the product. 83 Fed. Reg. 12,901, 12,902-03. It then announced its own research project of premium cigar usage patterns and declared premium cigars its "lowest priorit[y] of enforcement." JA640-41. Executing on the FDA's research project, the National Academies of Sciences, Engineering, and Medicine had little difficulty concluding that premium cigar usage patterns lead to lesser health effects and should affect how the products are regulated. *See* JA75, 96, 118-19. As the District Court correctly explained, the National Academies' report "contains important findings that may bear" on the decision to regulate premium cigars. JA10.

In short, as the District Court summarized elsewhere, the FDA's intervening actions and ongoing process "creates the distinct possibility that the agency's approach to premium cigars . . . 'may itself be changed.'" *Cigar Ass'n*, 436 F. Supp. 3d at 90 (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d

47

146, 150-51 (D.C. Cir. 1993)).[4]   And it would be profoundly inequitable for premium cigar manufacturers, retailers, and consumers to languish under an illegal regulatory decision, while any FDA consideration on remand slowly ambled along. After all, the Final Rule's warnings requirement for cigars was vacated *four years ago*, and the FDA still has taken no action on remand.  Because premium cigars are the agency's "lowest priority," JA187, the risk of the FDA sitting on this issue on remand is acute, and that strongly counsels in favor of vacatur.  *See*, *e.g.*, *Comcast Corp.*, 579 F.3d at 12 (Randolph, J., concurring).

## 2.  The Vacatur Decision is Not Exceptionally Disruptive.

The FDA contends that vacating the regulation of premium cigars would be disruptive.  FDA Br. at 40-45.  As an initial matter, it is not enough to say vacating an illegal agency decision would cause some disruption; of course, having one of its rules overturned is not going to be ideal for an agency.  Instead, courts look for exceptional disruption at a level consistent with the rare and exceptional nature of the remand without vacatur remedy.  JA8; *see also Cboe Futures Exch.*, 77 F.4th at 982 (requiring a showing of vacatur being "unduly disruptive" or "so disruptive to

---

[4] Contrary to the FDA's suggestion, FDA Br. at 40, a court may appropriately rely on intervening events when considering the appropriate remedy for a violation of the APA.  *See Committee on Ways & Means v. United States Dep't of the Treasury*, 575 F. Supp. 3d 53, 63-64 (D.D.C. 2021) (although the "right to [] relief 'must be determined as of the time of the hearing[,]" courts can appropriately "consider 'subsequent events,' […] as part of that determination" (citing *Senate Select Comm. on Pres'l Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974))).

justify a departure from our normal course" of eliminating an unlawful agency action).

The FDA does not even attempt to meet this standard. It also fails to engage with the District Court's reasoning, while presenting new arguments that were never raised below and are therefore forfeited.

First, the FDA claims vacatur disrupts Congress's intention that all tobacco products be "comprehensively" regulated. FDA Br. at 40. To begin, the FDA did not make this argument below, and it is waived. In any event, the FDA is misreading the Act. There, Congress chose to regulate cigarettes, smokeless tobacco, and roll-your-own tobacco. Act § 901(a). It was expressly agnostic on whether any cigars, much less premium cigars, should be regulated by the FDA, leaving that question for the agency to address through reasoned decisionmaking. *Id.* § 901(b).

Second, the Final Rule *initiated* regulation of premium cigars rather than merely adjusting an existing regulatory scheme. In the archetypal "limited circumstance" in which remand without vacatur applies, a deficient agency action incrementally changes a complex, carefully-balanced regulatory scheme, and vacatur of the part risks destabilization of the whole. *See, e.g.*, *Los Angeles*, 192 F.3d at 1021 (remanding without vacating a HHS decision incrementally adjusting Medicaid reimbursement rates). That unique circumstance is entirely absent here because the FDA did not regulate premium cigars in any way until issuing the Final

49

Rule. *See Dakota Rural Action v. United States Dep't of Agric.*, 668 F. Supp. 3d 1, 6 (D.D.C. 2023) (refusing to remand without vacatur when plaintiffs successfully challenged "a new rule").

Third, the FDA contends that vacatur will endanger those under 21, because of its effect on FDA rules barring sales to them. FDA Br. at 40-41. The District Court thoroughly rejected the FDA's argument in this regard, documenting the laws of all States barring sales to youth and of all but 10 States barring sales to those under the age of 21. JA12.[5] In any event, the FDA's argument here contradicts its own prior statements identifying premium cigars as its "*lowest priority*" for enforcement because of "their ***comparatively lower youth usage rates***." JA187 (emphasis added).

Fourth, the FDA claims disruption from freeing premium cigars from restrictions on sale through vending machines and against misleading advertising. FDA. Br. at 40. The District Court, however, faulted the FDA for not showing any problem or history of such sales or such misleading advertising of premium cigars.

---

[5] For these 10 States where state law does not prohibit tobacco sales to those between 18 and 21, FDA litigation counsel raises the possibility that retailers will not be able to sort out premium cigars from others when presented with an 18-21 year-old customer. FDA Br. at 41. The FDA did not raise this argument before the District Court and therefore waived it. Had the FDA raised it, it would have had to reconcile it with record evidence that premium cigars are overwhelmingly sold in specialty tobacco stores dedicated to the product, hardly portending an epidemic of convenience store clerks struggling with the classification of products.

JA12-13.  The FDA still does nothing to fill this gap, simply repeating its bare assertions below.

Fifth, the user fee scheme attached to the Final Rule's substantive regulations is no cause for the exceptional remedy of remand without vacatur.  FDA Br. at 42-43.  The FDA shrugs off the burden of user fees on premium cigar manufacturers and consumers, claiming they "total[ ] less than one cent per cigar."  *Id.* at 44.  But the FDA cites absolutely no record evidence for this assertion.  And the FDA does nothing to address the unfairness found by the District Court of continuing an annual $15-20 million burden on premium cigar manufacturers based on a rule that is deeply flawed.  JA14.

Nor is there any statutory tension in not charging premium cigar manufacturers for the costs of regulation imposed in violation of the APA.  FDA Br. at 42-43.  The Act imposes user fees only on tobacco products for which Congress mandated regulation or FDA deemed subject to the Act.  21 U.S.C. § 387s(b)(2)(B)(iii).  In the case of premium cigars, that latter event never legally happened.

The FDA also claims that it cannot administer a carveout in the user fee scheme for premium cigars.  FDA Br. at 42-43.  But the agency has been successfully administering such a carveout for almost eight months and will continue doing so for the foreseeable future.  The FDA's pleas of administrative difficulty strain

against its actions in this litigation, taking the maximum period to decide to appeal and not seeking a stay pending appeal.

That the FDA will have to do without user fees from premium cigar manufacturers following vacatur does not present the sort of financial concern that occasionally justifies withholding vacatur. For example, remand without vacatur might be justified if vacatur would lead to the unwinding of government benefits programs providing recurring payments to private parties. *See, e.g.*, *American Hosp. Ass'n v. Becerra*, 2023 WL 143337, at \*1-2 (D.D.C. Jan. 10, 2023). Or when vacatur would retrospectively reduce salaries paid by private parties but set by the Government. *See American Great Lakes*, 962 F.3d at 519. In those cases, vacatur would result in a transfer of funds from private parties. *See American Hosp. Ass'n*, 2023 WL 143337, at \*4-5. But there is no precedent for withholding vacatur when the agency that made the APA violation may have to part with money it collected from private parties.

Sixth, the FDA argues that regulation is not a significant burden for premium cigar manufacturers and retailers because several aspects of the Final Rule already have been vacated or enjoined as applied to premium cigars. FDA Br. at 44. Putting aside the oddity of the FDA taking refuge in its other errors trying to regulate these products, the District Court detailed a series of real burdens the Final Rule would continue to put on premium cigar manufacturers, retailers, and consumers absent

52

vacatur.  JA13-14.  The FDA says not a word, for example, about the requirement of testing the constituents of each of the thousands of types of premium cigars.  *Id.*  The record evidence showed that such testing could cost $75,000 per cigar type and millions or tens of millions of dollars per premium cigar manufacturer.  JA43, JA479-80.  And the District Court held that the prospect of such burdens is freezing premium cigar manufacturers in place.  JA13-14.  It is paralyzing them from investing in new facilities and product lines, given that products can take "a half-decade" to take from seed to "the shelf."  *Id.*

Premium cigar manufacturers also would be required to submit extensive additional materials for review for dozens, if not hundreds of products, including product, ingredient, label, and advertising submissions required for each new product and/or semi-annually for each product.  *See, e.g.*, 21 U.S.C. §§ 387e(i)(1) & (3), 387d(a)(1) & (c)(1)).

In addition, the District Court correctly held that the premium cigar industry should not be subject to new regulatory requirements rolling off the FDA's assembly line, when the decision to regulate it in the first place was arbitrary.  JA13-14.  Last year, for example, the FDA released a new manufacturing standard that (if the deeming decision were allowed to stand) would have automatically applied to premium cigar manufacturers.  It was poised to transform historic Central American facilities for rolling natural tobacco by hand into the equivalent of medical device

53

laboratories equipped with state-of-the-art ventilation systems and protective equipment. *Requirements for Tobacco Product Manufacturing Practice*, 88 Fed. Reg. 15,174, 15,198 (Mar. 10, 2023). These requirements might make sense for factories with whirling machines producing millions of identical cigarettes, but they would have been the end of artisans hand-crafting cigars adjacent to the fields in Nicaragua. And it only adds to the paralysis that the District Court held was unfair to impose on premium cigar manufacturers, when the rule initiating their regulation was arbitrarily adopted in the first instance.

Seventh, the FDA argues that the District Court erred by vacating the rule only with respect to a defined category of premium cigars, as defining that category should have been the agency's job. FDA Br. at 44-45. The FDA, however, did not make this argument below, and it is waived. In any event, the agency's argument is more one for vacating the Rule with respect to all cigars, than overturning the measured, narrow remedy crafted by the Court. In addition, the District Court drew the definition from that specified by the agency itself, when declaring premium cigars "its lowest priority" for enforcement of the premarket review requirements. *See Cigar Ass'n of Am.*, 480 F. Supp. 3d at 281 (explaining source of definition in FDA's enforcement announcement, JA640-43).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should affirm the District Court's decisions overturning and vacating the FDA's effort to regulate premium cigars.

Respectfully Submitted,

/s/ *Michael J. Edney*
Michael J. Edney
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 778-2204
*medney@huntonak.com*

*Counsel for Appellees Premium Cigar
Association and Cigar Rights of America*


/s/ *Brian T. Burgess*
Brian T. Burgess
Andrew Kim
Goodwin Procter LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000
*bburgess@goodwinlaw.com*
*andrewkim@goodwinlaw.com*

*Counsel for Appellee Cigar Association of
America*


April 15, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this filing complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-volume limitations of Fed. R. App. P. 28(b). This Response Brief contains 12,789 words, excluding the parts of the filing excluded by Fed. R. App. P. 27(d)(2) and 32(f).

/s/ *Michael J. Edney*
Michael J. Edney

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will automatically send e-mail notification of such filing to all counsel of record.

/s/ *Michael J. Edney*

Michael J. Edney